[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 INTRODUCTION
A man and woman meet in 1993, develop a relationship including sex over a three year period, and on October 6, 1996 a child is born out of wedlock. This case concerns custody and visitation rights over that child.
To put the case in perspective, the following has occurred since the birth of the child:
 • a paternity action was instituted in the State of California by the Mother and, by agreement, the court awarded the parties joint legal custody, physical custody to the Mother, and specified visitation for the Father;
 • several months thereafter the Mother, without agreement of the Father, returned to Connecticut and took up residence with her mother in Norwalk;
 • the Father then instituted an action in the State of California seeking the return of the child; CT Page 8213
 • an action to modify the California orders was then instituted in the Stamford Superior Court by the Mother and dismissed by the court for lack of jurisdiction (subsequently, the parties stipulated that the Connecticut courts should resolve all issues between the parties);
 • since her return to Connecticut, the Mother has filed four applications for restraining orders against the Father, in the Stamford Superior Court, in which numerous orders were entered (the Father also filed one application);
 • the Mother has an action for damages pending against the father in the United States District Court of Connecticut under the Violence Against Women Act;
 • the Father was twice arrested in Connecticut for threatening the Mother (both cases were nolled);
 • the father was also arrested two times for sexual assault and risk of injury to the minor child which are both pending (it is significant to note, to the court's chagrin, that both arrests took place in the courthouse, during the trial, and after prior arrangement with the police by the Mother and her counsel);
 • the Mother alleged she was raped four times by the Father since her return to Connecticut (she used different numbers at different times, ten being the highest number of rapes alleged);
 • within a month before the scheduled trial of the numerous motions before the court, the Mother contacted the Department of Children and Families alleging the Father had sexually molested the 3 1/2 year old child (DCF's preliminary findings substantiated the charges);
• 22 motions have been filed in the Bridgeport Superior Court;
 • the Stamford Family Services Unit evaluated the issues of custody and visitation and filed a report;
 • two psychological evaluations of the parties were conducted and reports filed;
• several therapists were employed;
• 13 different lawyers were retained at different times by the CT Page 8214 parties;
 • two private investigators were used by the Mother including one surveillance of the court appointed guardian ad litem;
• various depositions of a variety of individuals were taken;
 • the court assigned Judge Daniel Brennan to conduct a global mediation, which took 5 months and ultimately was unsuccessful, in an effort to resolve all issues between the parties;
 • the child has had two different guardian ad litems and one attorney at different stages of the proceedings;
 • six Connecticut judges issued orders in the different files, in addition to the orders entered by judges in the California and federal judicial actions;
 • before, during, and after the trial, the court urged settlement and appointed the Family Relations Supervisor, Janet Daigle-Esposito, to mediate, also without success;
• there were eight days of trial;
• 20 different witness testified including many professionals;
 • 101 exhibits were marked including one audio and two video tapes;
 • to date the parties admitted incurring approximately $246,970.00 in legal fees, not counting all fees for the California court, federal court, and Connecticut criminal court proceedings.
Suffice it to say that the parties had a tumultuous relationship and a bitter, angry, vengeful aftermath.
 MOTIONS
The motions before this court, exactly as titled by the parties, which will be disposed of by this opinion are as follows:
 • #103 Mother's AMENDED POST-JUDGMENT MOTION TO MODIFY EXISTING CUSTODY AND VISITATION ORDERS
 • #108 Guardian Ad Litem's MOTION FOR ATTORNEY'S FEES PENDENTE LITE CT Page 8215
 • #111 Mother's MOTION POST-JUDGMENT FOR MODIFICATION OF CHILD SUPPORT BASED ON A SUBSTANTIAL CHANGE IN CIRCUMSTANCES
 • #112 Mother's MOTION POST-JUDGMENT FOR TERMINATION OF VISITATION BY DEFENDANT OR IN THE ALTERNATIVE FOR SUPERVISED VISITATION
 • #113 Mother's MOTION POST-JUDGMENT FOR CONTEMPT FOR DEFENDANT'S FAILURE TO PAY CHILD SUPPORT
• #114 Father's MOTION FOR CONTEMPT
 • #119 Father's MOTION TO MODIFY CUSTODY AND/OR VISITATION (PENDENTE LITE)
 • Mother's request to continue ex parte restraining order against Father issued by the Stamford Superior Court in May.
Any other open and undecided motions in any of the Superior Court family files are marked off and may not be reclaimed.
 MOTHER
The Mother is 35 years of age, has never been married, and lives with her daughter in a two-bed room home owned by her mother. She runs a day care center for five or six children out of the home. Her work hours are between 7:30 a.m. and 5:00 to 6:00 p.m. She reports a modest income of $585 per week, $1,000 in assets, and $70,080 in debts. While in California for several years, she reportedly had several jobs including occasional work as an actress.
The court appointed psychological evaluator found the Mother to be troubled by emotional issues but afraid to acknowledge those issues. She tends to overvalue herself and to be unable to see her own shortcomings. In emotionally stimulating situations she would have difficulty making good decisions or coping effectively. Also, it would be likely that she would engage in ill-considered behavior, make mistakes, and then have difficulty learning from those mistakes. Rather than understand a situation, it is likely she would simply become angry and blame others. The evaluator concluded that she would not be a good candidate for traditional psychotherapy because she is so determined to avoid introspection.
She presents herself in court as an angry, harried, highly excitable, histrionic, paranoid, anxious, vengeful, and stressed out woman. Her testimony, for the most part, lacked credibility and her demeanor was CT Page 8216 inappropriate. It was not unusual for her to sneer at testimony she did not like and show disdain for witnesses with her body language. She compulsively took notes, frequently tugged at her counsel's sleeve, whispered in his ear, and actively participated in the proceedings.
Some of her claims made during the trial bordered on the bizarre. In 1994, after becoming pregnant, she testified she was dragged to an abortion clinic by the Father, pulled out of the car kicking and screaming, and forced to have an abortion against her will. She said she screamed at the doctor that she did not want an abortion but he put her under and did it anyway.
Despite full knowledge that the Father was a married man, she continued the affair with him after the aborted pregnancy, following him to numerous work assignments in different states. She became pregnant a second time, according to her she was raped by the Father, and this time she decided against an abortion despite asking for and receiving $500 from the Father for that purpose. During her pregnancy, she decided to tell the Father's wife, Gwen Cioffi, about the affair and the baby she was carrying. She did so by sending her a long letter enclosing a sonogram showing the fetus in her womb. Notwithstanding her claim of rape to conceive the child, the Father was invited to and participated in the birth. In fact, when he didn't arrive at the hospital right away, she beeped him on his pager as prearranged so that he could be present. Also, the child was given the father's name on the birth certificate.
Despite the Mother's claims that she was raped, threatened, manipulated, and abused throughout their relationship, there are many letters in her handwriting in evidence in which she professes undying love for the Father and apologizes for her conduct during the relationship. Further, she agreed, in a California court, while represented by counsel of her own choosing, to joint legal custody and a generous amount of visitation for the Father. In fact, she at first offered more visitation than provided for in the court order. She also voluntarily brought the baby to his house on two different occasions, once to visit privately with his Wife. On the latter occasion, she testified that the Wife threatened to shoot her and the baby.
There were two different guardian ad litems appointed by the court and one counsel for the minor child. The Mother was not happy with any of them and expressed herself accordingly. She was also not happy with two court appointed visitation facilitators who she claims did not do their jobs properly.
Likewise, she was unhappy with the court appointed Family Relations Counselor, Lacey Bernier, whom she accused of having an affair with the CT Page 8217 Father. She said they went out to lunch together, she would sit next to him in court, and on a couple of occasions, she saw them hug and kiss. She further testified that she was uncomfortable with the counselor's demeanor as she would roll her eyes at her and on one occasion threw a file at her. Significantly, Ms. Bernier testified the Mother was the most uncooperative client she has had in 13 years with the department. She described the Mother as hostile, skeptical, desperate, and having an underlying disrespect for her and the process. In fact, the Mother tried to have her removed from the case. The counselor denied having any social relationship with the Father and was shocked at the accusation.
On numerous occasions the Father was not afforded court ordered visitation on the grounds the child was sick. On one occasion the father came from California to visit only to be told he had the wrong weekend. Despite clear orders to the contrary, the maternal grandmother participated in several of the visitations. On one of the grandmother's participations, an altercation arose in a parking lot necessitating the intervention of the police.
The Mother also testified that she believed that the Father had physically abused the child. She told of seeing unexplained bruises and scratches on the child, after visits with the Father, as early as when she was three months old. In March of this year, she brought the child to the pediatrician for examination of two bruises. The doctor testified that he saw no evidence of physical abuse.
Perhaps most disturbing of all in this case are the Mother's allegations that the Father sexually molested the child. On May 3, she filed an application for a restraining order against the Father based upon a video which was taken by one of her private investigators. The application was denied by Hauser, J. This court reviewed the same video, including a freeze-frame excerpt, and could find no evidence of sexual abuse.
On May 4, a day after the denial of the restraining order application by Judge Hauser, the Mother testified that she became suspicious when she noticed a rash in the child's vaginal area. The child then told her, without being asked, that "that's where daddy touches me." Her first call was to her mother when she said "he really did it." She then called the child's pediatrician (Dr. Jennifer Gruen), DCF, the police, and her lawyer.
The pediatrician testified that her physical exam of the child was normal. She also testified that the Mother told her that DCF was involved. Later, the Mother also told the pediatrician not to talk to the guardian ad litem as she wanted it to be a surprise in court. While the CT Page 8218 doctor told the Mother there was not enough information to conclude there was sexual abuse, she nevertheless requested the doctor to include the information in the report. She also pressed the doctor to question the child about the sexual abuse statements which the doctor refused to do. Later, the Mother told the doctor she would not be called as a witness but to be sure to get paid from the Father if he calls you as a witness. It was also revealed that the Mother took the child to the Yale New Haven Sexual Abuse Clinic which was unable to find any evidence of sexual abuse.
A DCF investigator testified, after taking a history from the Mother and witnessing a forensic interview of the child through a two-way mirror, that the department was substantiating the allegations and would request a 96-hour hold should custody or visitation rights be awarded to the father. In essence, the department believed further investigation was needed. As a result, the Mother went to the Stamford Superior Court and obtained an ex parte restraining order, the continuation of which is before this court.
On May 18, the guardian ad litem, based upon a legitimate concern that repeated questioning of the three and a half year old child about sexual abuse issues would be harmful, obtained an order forbidding any further examination of the child without further order of the court. On the same day, the Mother called the DCF investigator who reported that the Mother was dramatic, very upset, claimed there was a conspiracy, the child would wind up dead, the system was not fair to her, and the Father had strong connections with the Family Relations Office and others. The investigator entertained the idea that the child may have been coached, especially in light of the custody dispute.
Dr. Deborah Gruen, a forensic psychologist, testified for the Mother about an examination she made of the child on May 27. She reported that the child told her, spontaneously, without being asked, that "daddy touched me with his finger" pointing to her vaginal area. On June 8 she repeated similar statements, again without any questions from the doctor. The doctor said she did not rule out coaching, was concerned she did not meet the father who was a very important missing element, and considered it a red flag that there was a hotly contested custody case and numerous law suits between the parties. The court was troubled that Dr. Gruen, in her testimony, saw no ethical problem in treating both the Mother and the child despite the complex situation of this case. It would seem appropriate that the child have her own therapist, independent of the Mother who obviously has her own problems and agendas.
A licensed clinical social worker, Goldie Winn, testified about an interview she had with the child on May 5 at the request of the Norwalk CT Page 8219 police department and DCF. She also testified that the child told her that "daddy touches me where I go pee pee" and that she found the child credible. At the conclusion of the interview, the Mother asked Ms. Winn, "Did you get it? Did she tell you? I'm glad. My attorney said if I didn't get a disclosure April would be taken away from me." After the statements of the Mother, the confidence of the interviewer was shaken. Ms. Winn also testified that the more times a child has to tell the story of abuse the less credible it might be. If a child is asked leading questions, she might believe it really happened. The court notes that, in this case, the mother discussed it with the child, as did the mother's friend, and the maternal grandmother. The witness, who only saw the child once, concluded by saying "I would not feel comfortable establishing sexual abuse based upon one interview with a toddler."
The Mother, in her zeal to protect her own role with the child, appears committed to denying any contact with the Father. She has attempted to maneuver the situation to carry out her own vendetta against him. These misguided efforts can only serve to severely damage the child she ostensibly seeks to protect. Sadly, the Mother's relentless attacks upon the Father, who rejected her as a mate and lover, is likely to do lasting damage to innocent little April.
The Mother is not without some redeeming qualities. There are significant strengths in her background. She is a loving, caring mother, who enjoys a good relationship with her child. All of the child's physical needs are taken care of including the maintenance of nice home. Other than as described in earlier paragraphs, she is genuinely interested in her daughter's welfare and wants to protect her from harm. There is no hint of emotional or physical abuse.
 FATHER
The Father is 50 years old, married for 19 years to a 52-year old woman, and employed as a musician, editor, and director. He works basically out of his home but is required to do a certain amount of traveling around the country. He reports a weekly income of $356, assets of $40,900, and liabilities of $90,200. His income has been reduced substantially because of the demands of the various law suits arising out of his relationship with the Mother. It is clear he has a much greater income capacity than that shown on his affidavit.
The court appointed psychological evaluator found the Father to be very bright, creative, mature, cooperative, rather emotionally insecure, rigid, inflexible, and somewhat paranoid. He is in therapy for depression and anxiety arising out of significant life stressors involving marital discord and an affair with another woman. His strengths outweigh his CT Page 8220 weaknesses. The Father's treating therapist reports that there are no indications that he is anything but a loving father, willing to extend himself to accommodate the needs of his child.
A major shortcoming in the Father's position is the fact that he lied to his wife regarding the affair with a woman 15 years his junior. He told his wife that he had broken it off but it was not long after that confession that he resumed the relationship. In fact, he lied to her several times about the affair and the pregnancy it ultimately produced. He demonstrated a weakness of character that continues to cause much pain and grief to many others.
Also of considerable significance is the fact that the Father has used drugs on a regular basis — apparently, even after his child was born, he regularly smoked marijuana. He told the court appointed evaluator that he last smoked early in 1998. He had different time frames in response to different questions regarding his drug use. He also admitted to injecting heroin when he was younger from which he contacted hepatitis C, a condition he still suffers from. A former alcohol abuser, he stated he has not had a drink since 1982.
He presents himself as deeply interested in his child's welfare and wanting to have a relationship with her. At first, he was satisfied to simply press for visitation rights. However, as time and the swirl of events passed, especially the allegations of sexual abuse, he concluded that the child should be raised by him. He expressed fears that the Mother's hatred of him and her disturbed, unstable personality would irreparably damage the child. He fears that he will not have a relationship with his daughter if he does not get custody.
His description of the affair which commenced in 1993, while not something to be condoned, was far more credible than that given by the Mother. Likewise, his description of the visitation problems he has experienced since the mother left for Connecticut is also more credible.
 CHILD
On October 7, 1996, April Grisante-Cioffi, was born to the parties. She has lived primarily with the Mother since her birth even though the parties shared joint legal custody pursuant to a California court order. In 1999, she was described by the Family Relations Counselor, as an adorable child, happy, content, and well adjusted-comfortable and at ease in the company of her mother. Both the counselor and the guardian ad litem indicate that her basic needs, food, clothing, and medical care, are well-taken care of. She appears to have suffered to some extent from the intense friction between her parents, especially as instigated by the CT Page 8221 Mother. During recent supervised visits, she would be hesitant, at first, to be with her father but would quickly open up to him. The visits went well.
 DISCUSSION
The court is very concerned with the Mother's obvious commitment to denying the Father any meaningful relationship with his daughter. Since her return to Connecticut with the child in 1997, without the agreement of the Father, she made that commitment very clear to many individuals. The sexual abuse allegations, made only a few weeks before the assigned trial date, was the capstone to that commitment. She apparently will go to any length to preserve her views, including risking lasting damage to her own daughter. If counseling does not work, the court fears that the child will be irreparably damaged.
Throughout these proceedings, the Mother has done little or nothing to foster a relationship between the Father and the child — indeed, she has sabotaged that relationship. As a result, the orders contained herein should be strictly construed by any court presented with alleged contemptuous conduct. Any wilful violation, by either party, should be treated with the utmost seriousness, including consideration of a change in physical custody or a termination of visitation rights. The Mother, in particular, must be made to understand that court orders are meant to be obeyed.
In ordering joint legal custody, the court is mindful of the difficulties involved in ordering parties to come to an agreement on major issues pertaining to the child. It is the court's hope that the communications counseling/therapy ordered will give the parties a sounding board for their legitimate differences. If that does not work, the court would be required to decide the disputed issues as they are presented. On the other hand, wilful contempt of court orders under the guise of a legitimate difference, could have drastic consequences for the contemnor.
 ORDERS 1. CUSTODY: The parties shall have joint legal custody of the minor child with physical custody to the Mother. In exercising joint legal custody, the parties shall cooperate and agree in making decisions on the following matters (in all other matters the parties may act alone): enrollment or termination in a particular private or public school; beginning or ending the regular practice of CT Page 8222 a religion; commencement of psychiatric, psychological, or other such mental health counseling or therapy; authorizing minor's driving license; change of child's principal residence; passport applications; enrollment in regular occurring extra curricular activities; and non-emergency health care.
 2. VISITATION: The Father shall have visitation in July as previously ordered by the court. In August, he shall have visitation on the third weekend as follows: Friday from 5 p.m. until 8 p.m., Saturday from 10 a.m. until 5 p.m., and Sunday from 10 a.m. to 5 p.m. The August visitation shall be supervised by either Skane Visitation Center, Fairfield Visitation Center, or a third party selected by the guardian ad litem. Any cost for said visitation shall be the Father's sole responsibility.
 Commencing in September, on the third weekend of each month, the Father shall have unsupervised visitation on Friday from 5 p.m. until 8 p.m.; and on Saturday from 10 a.m. until Sunday at 8 p.m.
 Commencing in September, the Father, at his option, shall have visitation on the first weekend of each month as described above. In the event he intends to exercise such optional visitation, he must give the Mother 72 hour written notice. Such notice shall also be sent to the guardian ad litem. On October 23rd at 10 a.m., the parties are ordered to return to court for further visitation scheduling.
 The Father is to advise the Mother of where the child will be sleeping but is not required to report on their daily activities. Neither the Mother nor the maternal grandmother shall be within 500 feet of the visitation except for pickup and delivery. No monitoring of the visitation by the Mother or her agents is permitted.
 The illness of the child may become the basis for missing an access period only upon advance presentation of a dated, signed note from a medical doctor specifying the illness and the period of absence required. The court finds that the Father is CT Page 8223 fully capable of providing the child with normal care during minor illness. The Mother is directed to advise the Father of all treatment modalities and to provide all the medication required during the access.
 3. CHILD'S COUNSELOR: The child is to cease counseling with Dr. Deborah Gruen immediately. The guardian ad litem will communicate this order to Dr. Gruen. The child is to immediately commence therapy with Diane S. Safran. The guardian ad litem is to communicate this counseling order to Ms. Safran and arrange the first appointment. The mother will bring the child to the appointments. Cost of the therapy, after any applicable insurance, is to be shared equally by the parties. Diane Saffron is to file a written report on the progress of the therapy with the Family Services Unit no later than October 20, 2000.
 4. MOTHER'S THERAPY: The mother is to continue in regular therapy with a therapist of her choice at her cost. The therapist is to file a written report on the progress of the therapy with the Family Services Unit no later than October 20. A copy of the mother's court ordered psychological report as well as a copy of this memorandum of decision will be promptly forwarded by the Family Services Unit to the Mother's therapist.
 5. FATHER'S THERAPY: The Father is to continue in regular therapy with a therapist of his choice at his cost. The therapist is to file a written report on the progress of the therapy with the Family Services Unit by October 20, 2000. A copy of the father's court ordered psychological report as well as a copy of this memorandum of decision will be promptly forwarded by the Family Services Unit to the Father's therapist.
 6. PARENTS' THERAPY: Both parents are ordered to undergo immediate counseling or therapy with a therapist selected by the Family Relations Counselor assigned to the case. In the event of a dispute over the name selected, the issue shall be immediately brought to the attention of the court for determination. The counseling is to be on a monthly CT Page 8224 basis commencing in July and shall continue until further order of the court. Un-reimbursed costs for counseling/therapy is to be equally shared by the parties. The purpose of the counseling is to develop communication strategies on how to best deal with this fractured situation in order to avoid continued harm to the child April. A copy of both parties' psychological reports as well as a copy of this memorandum of decision will be promptly forwarded by the Family Services Unit to the counselor/therapist selected.
 7. GUARDIAN AD LITEM FEES: The fees for the guardian ad litem Barbara Binford in the amount of $17,370 are to be shared equally by the parties. They are to be paid within 90 days from date. No additional legal fees are to be paid by either party for services rendered in this action until the guardian ad litem's fees are paid in full.
 8. MAIL, EMAIL, AND TELEPHONE ACCESS: The Father shall have the unfettered right to send mail, to email, and telephone the child at reasonable times. The Mother shall cooperate in the delivery of mail and effectuating the telephone access.
 9. CHILD SUPPORT: The Father is ordered to pay to the Mother $100 per month as child support, on the 15th
of each month commencing July 15, pursuant to a contingent wage withholding order. This order deviates from the guidelines which the court finds is warranted by the Father's visitation expenses occasioned by the mother's move to Connecticut.
 10. FAMILY SERVICES REFERRAL: This matter is referred to the Family Services Unit of the court for supervision until further order of the court.
 11. CONTEMPT MOTIONS: The contempt motions filed by the Mother and the the Father are denied.
 12. RESTRAINING ORDER: The Mother's request for extension of the restraining order issued by the Stamford Superior Court is denied.
CUTSUMPAS, J. CT Page 8225